# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

03 NOV 14 PM 3: 08

DISTRICT COURT
N.B. OF ALABAMA

| | |
|---|---|
| TAQUISHA WATTS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 02-JEO-0536-S |
| | ) |
| REGIONS BANK, | ) |
| | ) |
| Defendant. | ) |

**ENTERED**

**NOV 14 2003**

## MEMORANDUM OPINION

Plaintiff Taquisha Watts ("the plaintiff") filed this action, asserting various claims against Regions Bank under Title VII of the Civil Rights Act of 1964, as amended. (Doc. 1). Specifically, she alleges that the defendant discriminated against her "because of her sex, female, in violation of Title VII of the 'Civil Rights Act of 1964' in harassment, discrimination, and retaliation." (Doc. 1).[1] Although the plaintiff's complaint does not name her alleged harassers, and instead refers to them as "her supervisor and his manager," the defendant correctly presumes that the allegations are against Miguel Hardrick (her supervisor) and Eric McKee (Hardrick's Manager until McKee's termination on September 25, 2001). After answering the plaintiff's complaint, the defendant filed its motion for summary judgment as to the plaintiff's claims for (1) sexual harassment regarding McKee[2] and Samuel Brown (a coemployee),[3] (2) discrimination, and (3) retaliation. (Doc. 17). Upon consideration, the court finds that the motion is due to be

---

[1] References to "Doc. ___" are to the documents as numbered by the clerk of court in the court's record of the case.

[2] The defendant expressly declined to move for summary judgment on the plaintiff's sexual harassment claims as they pertain to Hardrick at this time.

[3] The defendant moves for summary judgment as to any sexual harassment claims regrading Samuel Brown as well. However, the plaintiff expressly denies that she asserts any claims regarding Brown, and as such, that portion of the defendant's motion is moot.

32

granted.

## FACTS[4]

### Plaintiff's Employment with Defendant Regions Bank

The plaintiff began her employment with Regions Bank ("Regions" or "the defendant") in November 1999 in the repossession department. (Watts' Deposition ("Watts") at 9, 30-34).[5] When she began her employment, she received a copy of Regions' sexual harassment policy in her employee handbook. (Watts at 52-53). Regions' sexual harassment policy states:

> It is the policy of Regions that its associates and their work environments shall be free from all forms of sexual and workplace harassment.
>
> Sexual harassment is verbal and physical conduct of a sexual nature by any employee, supervisor or manager, including sexual advances, requests for sexual favors or other such conduct of a sexual nature which tends to create an intimidating, hostile or offensive work environment. Sexual harassment may include, but is not limited to unwelcome sexual propositions; sexual innuendoes, suggestive remarks; vulgar or sexually explicit comments, gestures, or conduct; sexually oriented kidding, teasing, or practical jokes; and unwelcome physical contact.
>
> ... Associates who believe they are being subject to sexual or workplace harassment by a co-worker, supervisor, manager, customer or vendor, or believe their employment is being adversely affected by such conduct should report their complaint immediately to any of the following at the employee's election: a supervisor, department manager, human resources officer, the Corporate Employment/Employee Manager or the Corporate Human Resources Director. Associates who lodge good faith complaints will be protected from retaliation.
>
> All complaints of harassment will be referred, in writing, to the Corporate Human Resources Director, who has the full responsibility to receive and investigate such complaints and to recommend appropriate action to management.

---

[4]The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiff. They are the "'facts' for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)." *Underwood v. Life Ins. Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

[5] Watts' deposition is located at document 18, exhibit J.

2

(Defendant's Evidentiary Submission at J2).[6]

In June 2000, the plaintiff applied for and received a transfer to the data processing department. (Watts at 30-36, 45-48). In the data processing department, the plaintiff operated a machine that sorted checks and other items by account, serial number and amount. (Watts at 53-62; Hannah Aff. at ¶ 5; Hardrick Aff. at ¶ 4).[7] The machines film the checks and other items so that the bank has a record of the items in compliance with Federal Reserve requirements. (*Id.*).

The data processing department operates on three shifts: employees on the first shift work 7:30 a.m. to 3:30 p.m.; employees on the second shift work 3:30 p.m. to 11:30 p.m.; and employees on the third shift work 11:30 p.m. to 7:30 a.m.   (Watts at 38-50; Hannah Aff. at ¶ 4; Hardrick Aff. at ¶ 3). From June 2000 until August 2001, plaintiff worked the first shift. However, in August 2001, the plaintiff requested and received a schedule change to the swing shift, which was the latter half of the third shift and the first half of the first shift; thus, her schedule was 3:30 a.m. to 11:30 a.m. (Watts at 62-63).

Miguel Hardrick was the plaintiff's immediate supervisor when she worked on the first shift. (Watts at 50; Hardrick Aff. at ¶ 10). As operations supervisor, Hardrick was responsible for making sure that work in the data processing department was performed correctly and in a timely manner. (Hardrick Aff. at ¶ 5). Although Hardrick did not make decisions regarding hiring and terminating employees, he was responsible for supervising, assigning job tasks, evaluating employees, and providing guidance and discipline to the employees. (Hardrick Aff. at ¶ 6).

Until September 25, 2001, Hardrick's immediate supervisor was Eric McKee, who was the

---

[6] Defendant's evidentiary submissions are located at document 18.

[7] The affidavits are located at exhibits A and H.

Operations Manager. (Watts at 48). However, Regions terminated McKee on September 25, 2001, and Jay Hannah managed the department from that point on. (Burke Aff. at ¶¶ 15, 17; Hannah Aff. at ¶ 3).[8] Shane Shields, the Items Processing Manager, was McKee and Hannah's immediate supervisor. (Watts at 48; Shields Aff. at ¶¶ 2, 4).[9]

Regions maintains a tardiness policy that requires employees to report to work on time, punch in on time, and promptly report to their work area thereafter. (Watts at Ex. 8-9, 11, 14; Hardrick Aff. at ¶ 8). An employee is tardy if he or she punches the time clock as little as one minute late. (Watts at 66; Hardrick Aff. at ¶ 8).

During 2000 and 2001, Regions had a policy of not writing up employees for tardiness until the employee was tardy at least six times. (Shields Aff. at ¶ 3; Hardrick Aff. at ¶ 9). On the sixth tardy, the employee received a Memorandum of Understanding documenting the dates on which the employee was tardy and warning of what future action might be taken should the tardiness continue. (Shields Aff. at ¶ 3; Hardrick Aff. at ¶ 9). If the tardiness continued, the supervisor issued a written official warning to the employee and the employee was counseled that further tardiness could result in further action, up to and including termination. (Shields Aff. at ¶ 3; Hardrick Aff. at ¶ 9).

Throughout the course of the plaintiff's fourteen month employment in the data processing department, she was tardy for work no less than twenty-one times.[10] After receiving numerous

---

[8] Burke's affidavit is located at exhibit C.

[9] Shield's affidavit is located at exhibit B.

[10] The plaintiff was given a Memorandum of Understanding due to tardiness on September 13, 2000 (for being tardy on August 28, September 6, September 7, September 12, and September 13). On October 20, 2000, she was given a written Official Warning for being tardy six times since the Memorandum of Understanding a little over a month earlier. Specifically, she was tardy on September 25, September 26, October 3, October 13, October 17, and October 18. She was also tardy but not written up (or the write-ups were not included in the court's record) on: January 30, 2001, April 24, 2001, May 2, 2001, May 9,

Memorandums of Understanding regarding her tardiness, among other things, Hannah, Shields, and Virginia Burke, Regions' Employee Relations Specialist, agreed that the plaintiff would receive a final chance; and, on October 17, 2001, they met with the plaintiff to discuss her continuing tardiness and to advise her that she would be terminated if she was tardy one more time. (Watts at 165-167; Shields Aff. at ¶ 7; Burke Aff. at ¶ 18). Just two days after the meeting wherein Hannah, Shields, and Burke advised the plaintiff of her last chance, she was twenty minutes late for work. (Watts at 168; Ex. A15). At that time, Hannah, Shields, and Burke made the decision to terminate the plaintiff's employment. (Hannah Aff. at ¶ 13; Shields Aff. at ¶ 9; Burke Aff. at ¶ 20). Paul Lloyd, Regions' Group Human Resources Manager, approved the decision. (Lloyd Aff. at ¶ 10).

### The Alleged Discrimination

On August 27, 2001, the plaintiff complained to Virginia Burke, an employee relations specialist in Regions' Human Resources Department, that she thought she was being written up and harassed for things that other employees in the department were not being written up for. (Watts at 83-88). The plaintiff complained that although **she had been late and absent**, others had too. (Burke at 11). After speaking with Hardrick about the plaintiff's complaints, Burke

---

2001, May 14, 2001, May 21, 2001, August 14, 2001, August 16, 2001, August 18, 2001, August 21, 2001, August 22, 2001, October 4, 2001, and October 19, 2001. (Def.'s Ex. A1, 2, 3, 4, 8, 9, 12, 15). However, the plaintiff's disciplinary problems did not stop there: on December 4, 2000, she received a Memorandum of Understanding for "Negligence; Not following procedures," for failing to film sixteen runs [of checks and other items]; on December 19, 2000, she received a Memorandum of Understanding for "Negligence - Did [not] call or inform supervisor that she needed to be off . . .;" on March 23, 2001, she received a written Official Warning for "Negligence - Not following procedures - Turning off the microfilm while processing on the CPCS . . . ;" on May 30, 2001, she received a Memorandum of Understanding for "Waste of Worktime: Taquisha left Regions premises while on the job without clocking out"; on August 7, 2001, she received a written official warning for "Excessive Absentees/Negligence - TaQuisha did not call and talk to her supervisor to see if she could be off on 8/6/01," (after having been absent from her work on 2/1, 2/21, 3/20, 4/19, 4/27, and 5/3); and on October 18, 2001, she received a Memorandum of Understanding for "Negligence - on [October 15] TaQuisha did not follow procedures while processing inclearings on CPCS . . . ." Additionally, the plaintiff was given verbal warnings for tardiness on May 21, 2001, August 21, 2001, and October 17, 2001, at which time she was told that one more tardy would result in her termination.

made a determination that the plaintiff had been treated fairly and that the disciplines would not be removed. (Burke Aff. at ¶ 6).

On September 11, 2001, Burke met with the plaintiff in person to inform her that her disciplines would not be removed. At that point, the plaintiff alleged for the first time that Eric McKee had sexually harassed her and two of her co-workers, Talibra Boyd and Kim Williams. (Burke Aff. at ¶ 7; Watts at 85-91).

Although Watts did not give Burke details at the time, she subsequently alleged that around August 2000, McKee began harassing her about two to three times per week. (Watts at 72-74). Specifically, McKee would "touch, grope, expose hisself [sic], [and] say nasty things that he wanted to do." (Watts at 73). He would "come up behind [her] while [she] was at her machine, press hisself against [her], try to touch [her] breasts, put his hand on [her] butt, [and] try to stick his hands in the back of [her] pants." (Watts at 74). Additionally, McKee would allegedly say things to Watts such as "It's hard for you. Come on, put your hand on it. Make it go down" and "Touch your toes." (Watts at 74-77). On one occasion, McKee "pulled it out" and said to Watts "You see what I have got for you." (Watts at 75).

As a result of Watts' allegations of sexual harassment, Burke immediately undertook an investigation. (Burke Aff. at ¶ 9). Burke interviewed Watts' supervisor, Miguel Hardrick, McKee's supervisor, Shane Shields, and every employee Watts identified as witnessing the alleged sexual harassment, as being subject to the alleged sexual harassment, or as being treated differently from her. She also reviewed the personnel files and time cards for several employees on the first shift. (Burke Aff. at ¶ 9).

Through her interviews with the plaintiff's co-workers, Burke learned that most of the

6

employees had complaints about the way the Data Processing Department was run. (Burke at ¶¶ 25-26 & 41). For example, some of the employees complained that different shifts were treated differently: at month end, some shifts were allowed to take the day off or come in late, whereas other shifts weren't; some shifts had to clock out to go to lunch, whereas other shifts did not; and some supervisors handled things one way while other supervisors handled the same things differently. (*Id.*). Additionally, many of the employees complained that Sam Brown was treated more favorably than anyone else in the department. (Burke at ¶¶ 24, 33, 34 & 42). Furthermore, while several employees witnessed Eric McKee inappropriately touching Talibra Boyd and Kim Williams, none observed any inappropriate behavior toward the plaintiff.[11]  The only observation of conduct toward the plaintiff that may have been inappropriate was that, on one occasion, McKee may have leaned up against her inappropriately. (Burke at 38).

Based on this investigation, Burke concluded that McKee had violated Regions' sexual harassment policy with respect to Kim Williams and Talibra Boyd and terminated his employment as a result. (Burke Aff. at ¶ 15; Shields Aff. at ¶ 5). However, Burke was unable to determine whether McKee had sexually harassed the plaintiff.

## PROCEDURAL HISTORY

The plaintiff's complaint appears generally to allege sexual harassment, discrimination, and retaliation under Title VII of the Civil Rights Act of 1964, as amended. The defendant filed its motion for summary judgment on March 24, 2003. (Doc. 16). The plaintiff's brief in response was filed April 3, 2003. (Doc. 20). The plaintiff's response does not include a statement of facts

---

[11]Kim Williams observed McKee grabbing and touching Talibra Boyd and complained that he harassed her as well; Talibra Boyd complained that McKee had touched her inappropriately; and Jai Abrams saw McKee flirt with and touch Talibra Boyd and Kim Williams.

and summarily addresses the Title VII sexual harassment claim against McKee. (*Id.*).  It does not

address the discrimination and retaliation that she alludes to in the complaint.  (*Id.*).  The

defendant filed a reply brief in support of its motion for summary judgment. (Doc. 23).  The

plaintiff then filed a motion to file a reply to one specific issue, which the court permitted over the

opposition of the defendant.  (Doc. 24, 26, 27, & 29).

## DISCUSSION

### Summary Judgment Standard

Summary judgment is to be granted only if "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the declarations, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." FED. R. CIV. P. 56(c); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct.

2548, 91 L. Ed. 2d 265 (1986).  The party asking for summary judgment "bears the initial burden

to show the district court, by reference to materials on file, that there are no genuine issues of

material fact that should be decided at trial.  Only when that burden has been met does the burden

shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that

precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991);

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of

material fact, or by showing that the nonmoving party has failed to present evidence in support of

some element of her case on which she bears the ultimate burden of proof.  *Celotex,* 477 U.S. at

322-23; *see* FED. R. CIV. P. 56(a) and (b).  Once the moving party has met her burden, Rule 56(e)

"requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the

8

'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. (*Id.*).

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

### Hostile Work Environment/ Tangible Averse Employment Action Sexual Harassment

The plaintiff asserts a sexual harassment claim premised on the actions of both Hardrick and McKee. The defendant contends that summary judgment is due to be granted on this claim to the extent that it relates to McKee because Regions had a sexual harassment policy in place and as soon as the plaintiff made a complaint about McKee according to that policy, Regions promptly investigated the complaint and terminated McKee. (Doc. 17 at 16). Accordingly, the defendant argues that it has established a defense pursuant to *Faragher v. City of Boca Raton*, 524 U.S. 742, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998) and *Burlington Ind. v. Ellerth*, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998).

"When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and

9

create an abusive working environment, Title VII is violated." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 78, 118 S. Ct. 998, 1001, 140 L. Ed. 2d 201 (1998). To establish a claim for a hostile or abusive working environment, an employee must show:

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment. . . ; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

*Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 582 (11th Cir. 2000), *cert. denied*, 531 U.S. 1076, 121 S. Ct. 772, 148 L. Ed. 2d 671 (2001) (*citing Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc), *cert. denied*, 529 U.S. 1068, 120 S. Ct. 1674, 146 L. Ed. 2d 483 (2000)). In *Gupta*, the Eleventh Circuit stated:

> The fourth element . . . is the element that tests the mettle of most sexual harassment claims. Requiring the plaintiff to prove that the harassment is severe or pervasive ensures that Title VII does not become a mere "general civility code." *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998).

*Gupta*, 212 F.3d at 583. Title VII may include a prohibition of sexual harassment, but it is clearly not a federal civility code. *Mendoza*, 195 F.3d at 1245.

"Title VII 'does not prohibit all verbal or physical harassment in the workplace,' and 'does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex.' Instead, Title VII prohibits only the type of severe or pervasive sexual harassment that 'alter[s] the conditions of the victim's employment.'" *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) (*quoting Oncale*, 523 U.S. at 80-81).

In *Mendoza*, the Eleventh Circuit, sitting en banc, reiterated the standards applicable to hostile environment claims:

> Establishing that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an objective component. . . . . The employee must subjectively perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable. The environment must be one that a reasonable person would find hostile or abusive and that the victim subjectively perceives to be abusive. Furthermore, the objective severity of the harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.

> The objective component of this analysis is somewhat fact intensive. . . . The courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment.

*Mendoza*, 195 F.3d at 1246 (internal quotations and citations omitted). The Supreme Court in *Faragher* stated, "We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment . . . ." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 2284, 141 L. Ed. 2d 662 (1998) (*citing Carrero v. New York City Housing Auth.*, 890 F.2d 569, 577-78 (2nd Cir. 1989); *Moylan v. Maries County*, 792 F.2d 746, 749-50 (8th Cir. 1986).

The plaintiff alleges that she was subject to unwelcome sexual harassment by McKee during her employment. While she fails to specifically name who (aside from alleging that her supervisor and his manager sexually harassed her) in her complaint, she states therein that the harassers would: touch her breasts and/or her buttocks one or two times per week; attempt to put their hands in her pants on 10 or 15 occasions; try to unzip her shirt; come up behind her and rub their crotch against her; call her to his office and ask for sex; inquire about her undergarments;

11

and on one occasion, one of the harassers "pulled his penis out of his pants and tried to get plaintiff to 'touch it.'" (Doc. 1).

In her deposition, the plaintiff testified that McKee would "touch, grope, expose hisself [sic], [and] say nasty things that he wanted to do." (Watts at 73). He would "come up behind [her] while [she] was at her machine, press hisself against [her], try to touch [her] breasts, put his hand on [her] butt, [and] try to stick his hands in the back of [her] pants." (Watts at 74). Additionally, McKee would allegedly say things to Watts such as "It's hard for you. Come on, put your hand on it. Make it go down" and "Touch your toes." (Watts at 74-77). On one occasion, McKee "pulled it out" and said to Watts "You see what I have got for you." (Watts at 75).

The plaintiff alleges that these facts are sufficient to meet the burden described in *Faragher* and *Gupta*. The plaintiff is a member of a protected class. Her manager continuously touched, groped, exposed himself, and said nasty things to her - all things that could be considered harassment by a jury.[12] Because McKee was acting as a manager of the defendant at the times of the incidents, the plaintiff claims that the defendant is vicariously liable for damages caused by his behavior. Thus, she asserts that the motion for summary judgment is due to be denied as to this claim. Assuming, without deciding, that the alleged harassment of the plaintiff was sufficiently severe and pervasive as to alter her working conditions, the next step is to determine whether Regions is liable to the plaintiff for McKee's alleged conduct.

---

[12] The court notes, however, that the plaintiff was, in no way, "on her best behavior" during her employ with Regions Bank. In fact, the plaintiff testified that she engaged in explicit conversations with her supervisor and a co-worker regarding unconventional types of contraceptives they had used and that she engaged in sexual intercourse with her supervisor, Miguel Hardrick. (Watts at 95-103).

## Employer Liability

In *Frederick v. Sprint/United Management Company*, 246 F.3d 1305, 1311 (11th Cir.

2001), the Eleventh Circuit Court of Appeals stated:

> [W]hen analyzing whether the employer should be liable for a supervisor's
> harassment, courts should separate these cases into two groups: (1) harassment
> which culminates in a "tangible employment action," such as discharge, demotion
> or undesirable reassignment, and (2) harassment in which no adverse "tangible
> employment action" is taken but which is sufficient to constructively alter an
> employee's working conditions.

In the current matter, the plaintiff asserts that her termination was based on disciplines that she

received as a result of her supervisor and manager's disparate treatment of her due to sexual

harassment.

In *Johnson*, 234 F.3d 501, the Eleventh Circuit recognized a strict liability standard for

employers for sexual harassment where a tangible employment action occurred when the alleged

harasser was the plaintiff's supervisor and the alleged harasser/supervisor was involved in a

tangible employment action against the plaintiff as a result of the sexual harassment. *Johnson*,

234 F.3d at 509 (citing *Faragher*, 524 U.S. at 807 (1998)). Similarly, in *Llampallas v. Mini-*

*Circuits, Lab, Inc.,* 163 F.3d 1236, 1247 (11th Cir. 1998), the court stated:

> any time the harasser makes a tangible employment decision that adversely affects
> the plaintiff, an inference arises that there is a causal link between the harasser's
> discriminatory animus and the employment decision. A Title VII plaintiff,
> therefore, may establish her entire case simply by showing that she was sexually
> harassed by a fellow employee, and that the harasser took a tangible employment
> action against her.

The Eleventh Circuit has been "unwilling to read the *McDonnell Douglas-Burdine* framework"

into hostile environment claims when there is a tangible employment action involving the

harassing individual. *Johnson*, 234 F.3d at 510.

13

In its motion, the defendant asserts that the plaintiff's claim is due to be dismissed because the defendant terminated McKee after the plaintiff reported the harassment, and is, therefore, not liable for the alleged sexual harassment because it exercised reasonable care to prevent and correct any harassing behavior and because the plaintiff failed to take advantage of the preventative measures that were available. (Doc. 17).   However, the plaintiff argues that this analysis is misplaced because the affirmative defense that the defendant seeks to invoke is only available where "no tangible adverse employment action is taken." (Doc. 20).

Under *Ellerth*, 524 U.S. 742 and *Faragher*, 524 U.S. 775, an employer may prevail in a hostile work environment case involving alleged harassment by a supervisor, even if the supervisor in fact engaged in actionable harassment, if the employer is able to prove that :

>    (a) [it] exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and

>    (b) [the] plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise.

*Ellerth,* 524 U.S. at 765; *Faragher*, 524 U.S. at 807.  The promulgation of a workable anti-harassment policy may satisfy the first element's reasonable care standard.  *See Faragher*, 524 U.S. 807-08 (formal sexual harassment policy with sensible complaint procedure satisfies employer's duty of care).

The defendant's sexual harassment policy contained a grievance procedure and directed employees subject to harassment to complain to their supervisor, department manager, human resources officer, the Corporate Employment/Employee Manager or the Corporate Human Resources Director. (Defendant's Evidentiary Submission at J2).   While the plaintiff did

14

eventually file a grievance, she did not do so until almost a year after the alleged harassment occurred. In fact, the plaintiff did not complain about sexual harassment until her complaints about being unfairly written up were investigated and proved fruitless. Nonetheless, the plaintiff did complain and the bank immediately undertook an investigation of those complaints. Based upon that investigation, McKee's employment with Regions was terminated. Therefore, once Regions was made aware of the harassment, it immediately investigated and subsequently eliminated the problem.

However, the plaintiff argues that the defendant is not entitled to this affirmative defense because the defense is only applicable "when no tangible adverse employment action is taken" and the plaintiff's termination amounts to a tangible adverse employment action. (Doc. 20). In response, the defendant argues that the defense is only unavailable if the supervisor's harassment "culminates" or "results in" a "tangible employment action." *Faragher*, 524 U.S. at 808. Here, the defendant asserts, there is no evidence that McKee's harassment culminated or resulted in the plaintiff's termination and this is evidenced by the fact that McKee was terminated a month before the plaintiff was terminated and he, therefore, played no role in her termination.

In *Ellerth* and *Faragher*, *supra*, the Supreme Court instructed that, when determining employer liability for sexual harassment in the workplace, courts should no longer use the terms "quid pro quo" and "hostile environment" to define an employee's claim. Instead, courts should look at harassment claims as those that culminate in an adverse tangible employment action and those in which there is no adverse tangible employment action, but the harassment is sufficient to constructively alter the employee's working conditions. *See Frederick v. Sprint/United Management Company*, 246 F.3d 1305, 1311 (11th Cir. 2001). Thus, in the present case, the

15

plaintiff's claim against the defendant concerning McKee is premised on the "adverse 'tangible employment action'" theory, which, she asserts, would preclude the defense presently being asserted as to McKee's actions. *Frederick*, 246 F.3d at 1312.

While the plaintiff has not presented any evidence that would tend to show that her termination amounted to the carrying out of a sex-based threat, the plaintiff also claims that her employment was adversely affected by disciplinary write-ups that she received while other employees who committed similar offenses were not written-up. Although the plaintiff failed to submit any evidence in support of this contention, deposition testimony of at least one of plaintiff's coworkers (Boyd) reveals that she had the impression that the plaintiff was disciplined more frequently and for lesser offenses than her other coworkers. (Boyd at 33-40). The court, however, does not find Boyd's impression sufficient under the circumstances. The evidence, when viewed in a light most favorable to the plaintiff, shows that the write-ups were the result of Hardrick's actions and not those of McKee. Accordingly, even Boyd's comment does not assist the plaintiff on the present motion. Because the evidence does not demonstrate that McKee was associated with the write-ups, they cannot be used to precluded the assertion of the *Faragher/Ellerth* affirmative defense as it pertains to McKee. Accordingly, the motion is due to be granted as to this claim because the evidence demonstrates that the defendant acted precipitously once it learned of the plaintiff's complaint.[13]

### Discrimination - Disparate Treatment

The defendant next asserts that the plaintiff's sex discrimination claim, which the court

---

[13] The court also notes that a hostile environment sexual harassment claim is not necessarily based upon the actions of one individual. Although it may be difficult in some respects to separate the actions of McKee from those of Hardrick in determining whether the plaintiff was subject to a hostile work environment, under the present circumstances, the defendant is not precluded from asserting the *Faragher/Ellerth* defense concerning the plaintiff's claim as it relates to McKee.

interprets as a disparate treatment claim, is insufficient because the plaintiff cannot meet her burden of establishing a prima facie case and because she cannot rebut the defendant's proffered legitimate, nondiscriminatory reasons for her termination. (Doc. 18 at 22-23, 29-30).

The appropriate framework from which to evaluate the plaintiff's claim is the familiar *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 1824-25, 36 L. Ed. 2d 668 (1973), standard when circumstantial evidence is involved. *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1321 (11th Cir.), *opinion superseded in part in Jones v. Bessemer Carraway Medical Center*, 151 F.3d 1321 (11th Cir. 1998). The plaintiff has the initial "burden of establishing a prima facie case of [gender] discrimination." *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824.

In *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999), the Eleventh Circuit Court of Appeals stated that to establish a prima facie case of disparate treatment, the plaintiff must show that (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated male employees more favorably; and (4) she was qualified to do the job. If the plaintiff is able to establish a prima facie case, then the defendant must "articulate some legitimate, nondiscriminatory reason for the [disparate treatment]." *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824. If this is done, the plaintiff is required to show that the proffered reason was merely a pretext for the defendant's acts. *See Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 1093, 67 L. Ed. 2d 207 (1981). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*

The parties do not dispute that the plaintiff is a member of a protected group, that she was

17

subjected to an adverse job action, or her qualifications. They do dispute the reasons for her disciplinary write-ups. The plaintiff asserts that the reason was her sex and the defendant asserts that she was written up because she was habitually tardy.

The plaintiff attempts to establish a prima facie case of disparate treatment by asserting that (1) she belongs to a protected group; (2) she was subject to an adverse job action; and (3) others who were not subjected to alleged harassment were not written up as often as the plaintiff; and others, specifically Sam Brown and Talibra Boyd, were treated more favorably.[14]

As noted in *Jones*, "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Jones*, 137 F.3d at 1311. The defendant asserts that she has not established a *prima facie* case because she has not demonstrated that her excessive tardiness was not the true reason for her termination. (Doc. 17 at 18). While this argument is misplaced in the *prima facie* case context, the court agrees that she has failed to establish a *prima facie* case due to the lack of a comparator. Specifically, the court finds that the plaintiff has failed to present adequate evidence that Regions treated similarly situated employees differently. Through her investigation, Burke learned that other employees in the Data Processing Department, namely, Kim Williams, Talibra Boyd, Kevin Murphy, and Jai Abrams, felt like one employee in particular, Sam Brown,[15] was treated more favorably than the rest of the employees, including the other males. (Burke at 23-24, 33-35 & 41-42). Thus, the court finds that the plaintiff is unable to establish a prima facie case of disparate treatment

---

[14] The plaintiff makes no assertion regarding her job qualifications. The defendant, however, does not challenge the same either.

[15] The plaintiff stated in her deposition that she was treated most differently than Brown. (Watts at 87-88). She also stated that she was treated differently than everyone on the shift. (*Id.*).

18

premised upon her gender through the use of conlcusory statements that everyone was treated better than she was.  Accordingly, the defendant's motion is due to be granted on the plaintiff's discrimination claim.

### Retaliation

As stated by the United States Supreme Court:

> Under Title VII of the Civil Rights Act of 1964, 78 Stat. 255, as amended, 42 U.S.C. § 2000e-3(a), it is unlawful "for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."

*Clark County School Dist. v. Breeden*, 532 U.S. 268, 269, 121 S. Ct. 1508, 1509, 109 L . Ed. 2d 509 (2001).  Reading the plaintiff's complaint and arguments liberally, she appears to assert that her October termination was in retaliation for protected activities.[16]  The defendant contends, instead, that she was terminated for excessive tardiness.

The appropriate framework from which to evaluate the plaintiff's retaliation claim is the same *McDonnell Douglas* standard used in the disparate treatment analysis in the foregoing section.  The plaintiff has the initial "burden of establishing a prima facie case." *McDonnell Douglas,* 411 U.S. at 802, 93 S. Ct. at 1824.  "If a plaintiff establishes a prima facie case of [retaliation], the defendant employer must articulate a legitimate, nondiscriminatory reason for the challenged employment action." *Chambers v. Walt Disney World, Co.*, 132 F. Supp. 2d 1356, 1365 (M.D. Fla.) quoting *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en

---

[16] Although the plaintiff's Complaint fails to make this allegation specifically other than in the single use of the word "retaliation" in one paragraph, a review of her deposition testimony and EEO charge reveals that she claims that she was terminated, at least in part, in retaliation for complaining to Human Resources that Eric McKee sexually harassed her.  (Def.'s Ex. at J22).

banc). Once the defendant has articulated its legitimate, nondiscriminatory reasons for the plaintiff's termination, the court "must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered "legitimate reasons were not what actually motivated its conduct." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11ᵗʰ Cir.), *cert. denied*, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1997) (citing *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11ᵗʰ Cir. 1994)). This must include an evaluation of "whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence.'" *Combs*, 106 F.3d at 1538. If it is "determine[d] that a reasonable jury could conclude that the employer's articulated reasons were not the real reason for its decision, the court may not preempt the jury's role of determining whether to draw an inference of intentional discrimination from the plaintiff's prima facie case taken together with rejection of the employer's explanations for its action." *(Id.)*.

To establish a prima facie case of retaliation, the plaintiff must prove three elements: (1) that she engaged in statutorily protected activity; (2) that she suffered an adverse employment action; and (3) that the adverse employment action was causally related to the protected activity. *Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1388 (11ᵗʰ Cir. 1998), *cert. denied*, 525 U.S. 1000, 119 S. Ct. 509, 142 L. Ed. 2d 422 (1998).

In the instant case, the first two elements are not contested. The plaintiff engaged in the protected activity of complaining to Human Resources that her manager sexually harassed her.

20

She suffered an adverse employment action when she was terminated shortly thereafter. The defendant contests the third prong -- whether a causal connection exists between the protected activity and the termination. (Doc. 17 at 18). It asserts that the plaintiff was terminated as a result of her excessive tardiness. (*Id.*). It also asserts that, rather than discriminate or retaliate against her, Regions went to extraordinary lengths to rehabilitate the plaintiff and to help her become more productive. (*Id.*). Furthermore, Regions contends that, despite its efforts, the plaintiff's habitual attendance and punctuality problems persisted and led to her termination. (*Id.*).

In support of these contentions, the defendant presents time sheets verified by the plaintiff showing the days on which she was tardy and written disciplinary reports for those tardies that are also verified by the plaintiff, as well as written notes made by Burke during her investigation of the plaintiff's complaints. The plaintiff did not submit any evidence in opposition to the defendant's evidence on this issue.

The United States Supreme Court in *Breeden* found that a three month period between the issuance of a right-to-sue letter and an announcement by the plaintiff's supervisor that she was contemplating transferring the employee was insufficient to establish the causation element of her retaliation claim.[17] *Breeden*, 121 S. Ct. at 1511. In so finding, the Supreme Court noted, "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Id.* (citing *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001)).

---

[17] It is appropriate to note that the EEOC charge was filed in *Breeden* almost two years earlier. *Breeden*, 121 S. Ct. at 1511. Additionally, the significance, if any, of the right-to-sue letter was not raised until the matter was appealed to the Ninth Circuit. *Id.*

United States District Judge Robert B. Propst addressed the issue of what constitutes a

causal relationship in the retaliation context in *Taylor v. Renfro Corp.*, 84 F. Supp. 2d 1248 (N.D.

Ala. 2000). He stated:

> The Eleventh Circuit "interpret[s] 'the causal link requirement broadly; a
> plaintiff merely has to prove that the protected activity and the negative
> employment action are not completely unrelated.'" *Meeks v. Computer Assoc.
> International*, 15 F.3d 1013, 1021 (11th Cir. 1994) (quoting *Reichhold*, 988 F.2d at
> 1564). The Eleventh Circuit also does "not construe the 'causal link' . . . to be the
> sort of logical connection that would justify a prescription that the protected
> [activity] in fact prompted the adverse action. Such a connection would rise to the
> level of direct evidence of discrimination, shifting the burden of persuasion to the
> defendant." *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th
> Cir. 1985). And while not a per se requirement, courts do consider the amount of
> time lapsed between the time of the complaint and the time of the adverse
> employment action. *See Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554,
> 1556 (11th Cir. 1995); *Maniccia v. Brown*, 171 F.3d 1364, 1369-70 (11th Cir. 1999).
>
> A causal link has been found sufficient to withstand a defendant's motion
> for summary judgement, for example, where an employer discovered an
> employee's EEOC charge and a series of adverse employment actions commenced
> almost immediately, *Wideman*, 141 F.3d at 1457; where a supervisor was
> displeased with a HEW investigation and associated the employee who suffered
> adverse employment action with the investigation, *Simmons*, 757 F.2d at 1189; and
> where a plaintiff complained of sexual harassment in June, 1995, was terminated in
> April, 1997, and the plaintiff's performance evaluations for her 18 years of
> employment had been favorable, *Mortenson*, 54 F. Supp. 2d at 1124-25.
>
> A causal link has not been found, for example, where the plaintiff failed a
> test and passing the test was necessary for being offered the job at issue, *Fleming v.
> Boeing Co.*, 120 F.3d 242, 248 (11th Cir. 1997); where the adverse employment
> action occurred 15 and 21 months, respectively, after the plaintiff filed a grievance
> against her employer, *Maniccia*, 171 F.3d at 1370 ("The only causal connection
> established by the evidence is between Appellant's misconduct and her
> termination."); where the plaintiff failed to complete necessary management tasks,
> had a poor working relationship, and refused to accept constructive criticism,
> *Coutu*, 47 F.3d at 1074-75; where the time lapse between plaintiff's complaint and
> her termination was 16 months, *Aldridge*, 847 F. Supp. at 486; and where
> plaintiff's complaint was thoroughly investigated, a detailed report was filed
> concerning the investigation, the subject of the complaint was sanctioned,
> strenuous efforts were made to put plaintiff into another position within the

company, and plaintiff was ultimately terminated six months after her complaint was filed, *Farley v. American Cast Iron Pipe Co.*, 115 F.3d 1548, 1555 (11th Cir. 1997).

> In this case, plaintiff was terminated approximately four months after her last formal complaint regarding Richardson's conduct. The ensuing investigation consisted of Todd asking Richardson and Ingle what had happened (but did not include asking plaintiff what had happened), and cautioning Richardson and Ingle to not say things which might be misinterpreted by other employees. She was terminated for recounting socks in violation of company policy. She admitted to recounting socks, but claimed it was inadvertent. Viewing the situation in the light most favorable to the plaintiff, she made three "formal" complaints, and she allegedly made numerous "informal" complaints up to January of 1997, one month prior to her termination. Her work record prior to February 21, 1997, had been unblemished. Richardson characterized her as a very good worker. [ ] Richardson was also aware that Taylor had complained to Bennett about his conduct. [ ] She was terminated on her first mistake, despite the fact that she admitted the error and gave an explanation for it. Based on this, it does not appear that the employment action and plaintiff's complaints were wholly unrelated. Thus, plaintiff has satisfied the third prong.

*Taylor*, 84 F. Supp. 2d at 1259-60 (footnotes omitted).

After reviewing these cases and the discussions therein, the court finds that the inquiry necessary to determine whether the requisite relationship has been established is very case specific. No one aspect of the consideration is necessarily determinative. Under the present facts, the court finds that the causal relationship between the plaintiff's complaint and her termination is not sufficiently established to defeat the defendant's motion. First, there is a six week lapse between her complaint (September 11, 2001) and the termination (October 19, 2001). Second, unlike the plaintiff in *Taylor*, Watts did not have an "unblemished" two year work record. (*Id.* at 1249, 1260). Instead, she had an employment record fraught with disciplinary problems and she had been given numerous chances to improve her attendance problems. Third, McKee was swiftly terminated after the complaint (September 25, 2001) and he played no role in the

plaintiff's termination as he was no longer employed with Regions at that time. Even if, for argument's sake, the court finds that the plaintiff received disciplinary reports more frequently than other employees for the same offenses before McKee's termination, the fact remains that after the investigation wherein Burke decided to let the plaintiff's disciplines stand, Burke, Shields, and Hannah met with the plaintiff, discussed her attendance and punctuality problems with her, gave her the opportunity to let them know if she had a problem reporting to work on time, and gave her a final warning. Two days later, the plaintiff again failed to get to work on time. This is not evidence of retaliation, but of the plaintiff once again failing to conform her conduct to the employer's reasonable requirements. Fourth, to satisfy this element, the court would have to rely almost exclusively on the temporal proximity which is not sufficiently close under the circumstances to overcome the present motion. To find the temporal proximity sufficient to satisfy this element would place an unreasonable burden on an employer when dealing with an employee who consistently has had time and attendance problems and who has been warned. The fact that she levied a complaint against a manager, which was quickly dealt with, cannot insulate her from compliance with the defendant's time and attendance requirements.

In light of the foregoing, and the fact that the decision to terminate the plaintiff was made by Burke, Shields, and Hannah and finally approved by Paul Lloyd, the court finds that the plaintiff's termination was a result of her habitual tardiness and not causally related to her complaints of sexual harassment. As such, the plaintiff cannot establish a prima facie case of retaliation. Therefore, the defendant's motion for summary judgment on the plaintiff's retaliation claim is due to be granted.

Even if the court had found that the plaintiff established a *prima facie* case of retaliation,

24

the next step would have been to determine whether the defendant articulated a legitimate,

nondiscriminatory reason for her termination.  As previously stated, the defendant asserts that the

plaintiff was terminated because of ". . . repeated tardiness and attendance violations, including

her failure to call in and report off to a supervisor, her leaving the premises without clocking out,

her clocking in to work but not promptly reporting to the Department, her excessive absenteeism,

and her habitual tardiness." (Doc. 17, p. 18).  Although the plaintiff disputes some of her write-

ups (namely the 11/27/2000 and 8/25/2001 write-ups for "Negligence") and disputes that she was

verbally warned on several occasions about her tardiness, she does not dispute that she was tardy

on any of the occasions for which she received a written warning.  (Watts Dep. at 121-22, 125,

133, 144, 149, 152, 156).  The undisputed portions of the record demonstrate that the plaintiff was

tardy on at least twenty-one occasions.  Nonetheless, the plaintiff does not consider her tardiness

or absenteeism excessive, but would consider being absent or tardy three or four times a week

excessive "because it is more days than you work." (Watts Dep. at 149).  Furthermore, while the

plaintiff "wouldn't say [that her attendance was] acceptable . . . [she] wasn't late, as being

unacceptable, like they [Regions] are trying to make it out to be." (Watts Dep. at 160-61).  The

plaintiff's subjective opinion as to whether her tardiness was excessive is irrelevant.

Because the defendant has articulated a legitimate, non-discriminatory reason for the

plaintiff's termination, (excessive tardiness and attendance problems), the plaintiff must

demonstrate that the proffered reason is pretextual.  If the plaintiff fails to offer evidence showing

that each of the defendant's proffered reasons are pretextual, then summary judgment is

mandatory.  *Chapman v. Al. Transp.*, 229 F.3d 1012, 1037 (11th Cir. 2000) (en banc).

Accordingly, the court must "determine whether the plaintiff has cast sufficient doubt on the

25

defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude

that the employer's proffered "legitimate reasons were not what actually motivated its conduct."

*Combs*, 106 F.3d at 1538.

The court does not find that "the plaintiff has demonstrated 'such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons for its action[s] that a reasonable fact finder could find them unworthy of

credence.'" *Combs*, 106 F.3d at 1538. As just noted, the plaintiff does not dispute that she was

tardy on the occasions for which she was written up. As such, even if the court had found that she

presented a *prima facie* case of retaliation, it would have further found that she failed to establish

that the defendant's legitimate business reason for her termination was pretext for discrimination.

## CONCLUSION

Premised on the foregoing, the defendants' motion for summary judgment is due to be

granted. An order in accordance with the court's findings will be entered contemporaneously

herewith.

**DONE**, this _14th_ day of November, 2003.

_____

**JOHN E. OTT**
United States Magistrate Judge

26